DANIEL F. McCARTHY, as Administrator of the Estate of ANDREW F. McCARTHY, Deceased, Appellant, *v.* THE PENNSYLVANIA RAILROAD COMPANY, Respondent.

MASTER AND SERVANT — NEGLIGENCE OF RAILROAD COMPANY IN FAILING TO ADOPT AND ENFORCE RULES FOR THE SAFETY OF ITS TRAINS AND THOSE EMPLOYED THEREON — SUFFICIENCY OF RULES — QUESTION OF FACT. The evidence examined in an action brought to recover for the death of a locomotive fireman resulting from a "head-on" collision between two trains on defendant's railroad, alleged to have been caused by the failure of the defendant to adopt and enforce proper rules and precautions for the safety of its trains and those employed upon them, in which action the trial court directed a verdict for the defendant upon the ground that the death of plaintiff's intestate was caused by the negligence of a co-servant, and held that the case should have been submitted to the jury upon two questions of fact: (1) Whether the rules and regulations of the defendant, under which trains were operated by the train dispatcher, who represented the defendant in the management of its trains, were sufficient or not; and (2) whether, in taking verbal orders from a local telegraph operator as to the movements of an opposing train, the engineer of the train, upon which plaintiff's intestate was working at the time of the collision, followed a general custom which had been established, with the consent and approval of the defendant, under directions from defendant's trainmaster who stood in the place of defendant for the purpose of seeing that proper precautions were taken to insure the safety of trains.

*McCarthy* v. *Pennsylvania R. R. Co.*, 115 App. Div. 915, reversed.

(Argued May 30, 1907; decided June 14, 1907.)

APPEAL from a judgment, entered November 26, 1906, upon an order of the Appellate Division of the Supreme Court in the fourth judicial department overruling plaintiff's

exceptions, ordered to be heard in the first instance by the Appellate Division, denying a motion for a new trial and directing judgment for defendant on the verdict directed by the trial court.

The plaintiff's intestate, a fireman upon one of defendant's locomotive engines, was killed in a "head-on" collision which occurred on the defendant's railroad between Delevan and Lime Lake on the 25th day of July, 1904. The defendant's railroad has its northerly terminus at Buffalo and runs thence in a southerly direction through various towns and villages in this state to the city of Olean and from thence into the state of Pennsylvania. Beginning with Protection on the north and going south, the various stations which are within the zone of this controversy are Chaffee, Arcade, Delevan, Lime Lake, Machias, Franklinville, Cadiz, Ischua, Hinsdale and Olean. This stretch of railroad consists of a single-track line, except at Buffalo for a distance to the south and at Olean for a distance to the north where there are double tracks, and between these termini there are various sidings. The defendant prior to July 25, 1904, had adopted and promulgated rules for the running of its trains, and those which are material to the issue at bar were as follows: " 500. Special Orders, directing movements varying from, or additional to, the time-table, will be issued by the authority and over the signature of the Superintendent. They are not to be used for movements that can be provided for by rule or time-table. They must not contain information or instructions not essentially a part of them."

" 501. Each order must be given in the same words to all persons or trains directly affected by it, so that each shall have a duplicate of what is given to the others. Preferably an order should include but one specific movement."

" 503. Orders must be addressed to those who are to execute them, naming the place at which each is to receive his copy. Those for a train must be addressed to the conductor and engineman, and also to a person acting as pilot. A copy for each person addressed must be supplied by the operator."

" 504. Each order must be written in full in a book provided for the purpose at the Superintendent's office; and with it must be recorded the names of trainmen and others who have signed for the order, the time and signals showing when and from what offices the. order and responses were transmitted and the train despatcher's initials. These records must be made at once on the original copy, and not afterward from memory or memoranda."

" 525. Operators will promptly record and report to the Superintendent the time of departure of all trains, and the directions in which extra trains are moving. They will record the time of arrival of trains, and report it when so directed."

" 26. Green signifies caution, and is a signal to go slowly."

" 36. Two green flags by day and two green lights by night, displayed in the places provided for that purpose on the front of an engine, denote that the train is followed by another train running on the same schedule, and entitled to the same time-table rights as the train carrying the signals."

" 112. When signals displayed for a following train on single track are taken down at any point before the following train arrives, the conductor must inform the Superintendent promptly by telegraph, and also the operator or switchman; and the latter, unless there is some other provision for the purpose, must notify all opposing trains of the same or inferior class leaving that point before the train arrives for which signals were displayed."

" 109. All messages or orders respecting the movements of trains or the conditions of track or bridges must be in writing."

" 218. Train despatchers report to and receive their instructions from the Superintendent. It is their duty to issue telegraphic orders for the movement of trains in the name of the Superintendent; see that they are transmitted and recorded in the manner prescribed; and have a record kept showing the time each train passes each telegraph office."

" 217. Train masters report to and receive instructions

from the Superintendent. It is their duty to take charge of the movement of the traffic; exercise supervision over the men employed on the trains; see that they understand and observe the rules, and suspend them when necessary for neglect of duty; * * * and see that proper precautions are taken to ensure the safety of trains and property."

Further facts appear in the opinion.

*George E. Spring* and *James T. Ward* for appellant. The defendant in the proper discharge of its duty to its servant was bound to guard against the practice of taking verbal directions for the movement of its trains from the local operator. (*Koehler* v. *N. Y. S. Co.*, 183 N. Y. 1; *Doing* v. *N. Y. & W. R. R. Co.*, 151 N. Y. 579; *Whittaker* v. *D. & H. Co.*, 126 N. Y. 544; *O'Brian* v. *B. F. Co.*, 183 N. Y. 317; *De Voe* v. *N. Y. C. & H. R. R. R. Co.*, 174 N. Y. 1; *S. F. P. R. R. Co.* v. *Holmes*, 202 U. S. 38–45; Wood on Master & Servant, 794, § 403.) It was incumbent upon the defendant to give the persons in charge of extra 6324 notice of the variation in the schedule of its trains. (*Hankins* v. *N. Y., L. E. & W. R. R. Co.*, 142 N. Y. 416; *Flike* v. *B. & A. R. R. Co.*, 49 N. Y. 549; *Dana* v. *N. Y. C. & H. R. R. R. Co.*, 92 N. Y. 639; *McChesney* v. *P. R. R. Co.*, 74 Hun, 150.) The operator at Machias was not guilty of any such negligence as will relieve the defendant from liability, and as to the acts which he performed he was not a fellow-servant of plaintiff's intestate. (*Fuller* v. *Jewett*, 80 N. Y. 46; *Benzing* v. *Steinway*, 101 N. Y. 547; *Bailey* v. *R., W. & O. R. R. Co.*, 139 N. Y. 302.)

*Frank Rumsey* for respondent. The rules governing the movement of trains were sufficient, if observed by train 6324, to have prevented that train going north of Machias without orders as against train fourth, 156. (*Niles* v. *N. Y. C. & H. R. R. R. Co.*, 14 App. Div. 58; *Wooden* v. *W. N. Y. & P. Ry. Co.*, 147 N. Y. 508; *Vedder* v. *Fellows*, 20 N. Y. 126; *Corcoran* v. *D., L. & W. R. R. Co.*, 126 N. Y. 674; *Avery*

v. *N. Y. C. & H. R. R. R. Co.*, 121 N. Y. 31.)   There was no practice or rule permitting conductors or enginemen to take verbal directions for the movement of trains.   If the proximate cause of the accident in question was misinformation given to the engineer of the extra by Connors, the day operator at Machias Junction, the negligence was that of a co-employee of the plaintiff's intestate and not of the defendant company.   (*Slater* v. *Jewett*, 85 N. Y. 61; *Crispin* v. *Babbitt*, 85 N. Y. 121; *Beuenfeld* v. *Baumann*, 40 App. Div. 505; *N. P. R. R. Co.* v. *Dixon*, 194 U. S. 338.)

Werner, J.   As indicated in the foregoing recital of facts, this action is brought to recover damages for the death of an employee, alleged to have been caused by the negligence of the defendant employer.   The specific charge of negligence, stated in various forms in the complaint, is that the defendant omitted to adopt, promulgate and enforce proper rules, regulations and precautions for the operations of its trains, and that in consequence of this neglect of duty the collision occurred which resulted in the death of plaintiff's intestate. The learned court at Trial Term directed a verdict for the defendant upon the theory that the death of plaintiff's intestate was caused by the negligence of a co-employee, and ordered plaintiff's exceptions to be heard at the Appellate Division.   In that tribunal the plaintiff's exceptions were overruled by a divided court, and from the judgment entered upon that decision the plaintiff has appealed to this court.

This case belongs to a class of cases governed by principles of law that have become axiomatic.   The difficulties which beset the courts in the disposition of such cases are not in the law, but in its adaptation to the endless variety of facts to which the law must be applied.   In every such case the plaintiff comes into court invoking the rule that it is the master's duty to exercise reasonable care to provide his servant with a safe place in which to work, with proper tools and appliances with which to work, with competent fellow-servants with whom to work, and with such rules and regulations as are

needful for the proper control of these various agencies; and in every such case the plaintiff is met with the defendant's assertion of the rule that a servant assumes all the risks of his employment, which are as obvious to him as they are to the master, as well as all other risks which are necessarily incident to his employment after the master has fulfilled all the obligations imposed upon him by law.   In the case at bar the plaintiff predicates his right to recover upon the defendant's failure to adopt and enforce proper precautions for the safety of its trains and those employed upon them.   The defendant asserts its right to judgment upon the plea that it had done all that was required of it in that behalf, and that the death of plaintiff's intestate was due to the negligence of his co-employees in failing to observe and obey the rules under which its trains should have been operated.   A clear understanding and correct decision of the issue thus framed requires a minute statement of some further facts.

Train No. 156 was one of the defendant's regular freight trains of the third class which, on the day of the accident, was running southerly in four sections from Buffalo, which is designated as "GD Tower," to Olean which is called "AD Tower."   Train 6324 was an extra freight, upon which plaintiff's intestate was fireman, running northerly from "AD Tower" (Olean) to "GD Tower" (Buffalo), under a general order to run ahead of third class trains going in the same direction.   The movements of the first section of train 156 are not referred to in the record because that section had no relation whatever to the collision in which the plaintiff's intestate lost his life.   The only mention of the second section of train 156 is that contained in an order from defendant's train dispatcher, which was received at Hinsdale by the conductor and engineman of the north-bound extra No. 6324 to meet at Ischua, which is the first station north of Olean.   The southbound second section of 156 and the north-bound extra 6324 having met at Ischua, the latter proceeded on to Cadiz where it received "Order 28" directing that "extra 6324 has right of track against 3rd 156 Cadiz to Machias."   Pursuant to this

order the extra proceeded north to Machias, arriving there at
7 : 20 A. M.   Prior to that time, however, an order had been
sent out from the dispatcher's office which was delivered to
the conductor and engineman of the 3rd section of 156 at
Arcade, the third station north of Machias, stating that
" Engines 1884 and 1863 are annulled as 3rd and 4th sections
156 from Machias.   Engine 1863 will run as 3rd 156 Machias
to AD Tower."   Thereupon the 3rd section of 156 proceeded
southerly to Lime Lake, which is the first station north of
Machias, and there left its cars upon the siding, the engine going
south to Machias where it arrived at 6 : 10 A. M. and imme-
diately turned about to go back to Buffalo.   After the north-
bound extra reached Machias, the engineer of that train went
to the window of the telegraph operator's office and asked for
orders.   The operator was just receiving an order (No. 42)
directing the engine released from the 3rd section of 156 to
meet south-bound train No. 150 at Protection and announcing
that " Extra 6324 has right of track against No. 150 Machias
to Arcade."   The engineer of extra 6324, having learned that
section 3 of train 156 had arrived at Machias and returned
to Buffalo, and perceiving that he had no further order
against it, received order No. 42 and, after reading it
asked Connors, the day operator at Machias, if the 3rd
156 had been there, and Connors replied " everything is all
right; go ahead."   The engineer then asked Connors if
the 3rd 156 carried signals, to which the latter again replied
" everything is all right to go ahead."   Upon this informa-
tion the extra train 6324 proceeded northerly, arriving at
Lime Lake, the first station north of Machias, where the sema-
phore was down, which indicated that the block was clear and
that the train had the right to proceed.   It went on for some
distance to a point between Lime Lake and Delevan, where
it collided with the 4th section of train 156, as above stated.
No bulletin had been sent from the train dispatcher's office
to advise any opposing train of the movements of section 4
of train 156, and the crew of extra 6324 were ignorant of its
existence.

A brief analysis of the situation disclosed by the foregoing facts will reveal the point at which we think the defendant failed to do all that the law required of it. Train No. 156 was being run in four sections. To insure the safety of opposing trains it was, therefore, necessary to advise the latter of the movements of any one of these sections running in the same territory and on the same time schedule. We do not know and are not concerned with what was done with the 1st section of train 156, for that had passed from the zone between Olean and Buffalo before the extra 6324 had arrived upon it. All that we know of the 2nd section of train 156 is that the crew of extra 6324 were notified at Hinsdale to meet it at Ischua, and there they met. Presumably the second section carried the green signals which were a warning that there was another section to follow; but whether that is so or not is immaterial since it appears that at Cadiz the extra 6324 received orders that it had the right of way from that station to Machias as against section 3 of train 156. When the extra arrived at Machias it had met and passed section 2 and expected to meet section 3, but the latter had been annulled and the engine had returned to Buffalo. It is true that the 4th section was to run as the 3rd section from Machias to Olean, but where it was and what its movements were to be after the extra 6324 reached Machias, was known only to those in control of the movements of defendant's trains at the train dispatcher's office. There were only two methods by which the engineer and conductor of extra No. 6324 could have been advised at Machias of the movements of section 4 of train No. 156. One was by a direct order to be delivered to them, and the other was by an order to the local operator which could have been communicated to them at Machias. The defendant's train dispatcher, who concededly represented the defendant, did neither of these things, but contented himself with stating the bare fact that extra No. 6324 would have the right of way against train No. 150 Machias to Arcade. This was either the equivalent of a statement that there would be no opposing train to look out for

12

except 150; or it was so equivocal in its terms as to give the crew of extra 6324 no clear idea of what they were to do. If the former view is taken of order No. 42, it would seem that the engineer of extra No. 6324 clearly had the right to proceed without further inquiry; and if the order is capable of the latter construction, the engineer did just what he says the trainmaster instructed him to do in such an emergency, namely, to take the local operator's word as to the movement of trains. In either event the result is to make the sufficiency of the defendant's rules a question of fact for the arbitrament of a jury rather than a question of law for the decision of a court.

Counsel for the defendant contends that the language of order No. 42 clearly limited the extra train's right of way to a single opposing train, and that was No. 150; and this, he argues, was the construction which McCleary, the engineer of extra No. 6324, placed upon the order, as is shown by his admission that after he looked at the order against 150, he knew he had no further order against 156. There are two answers to this contention. The first is that the plaintiff cannot be bound by McCleary's erroneous construction, if it was erroneous, of the order against train No. 150; and the second is that the instructions received from Connors " that everything is all right to go ahead," were shown to have been a part of defendant's regular method of operations. McCleary testified that in the school of instructions established by the trainmaster for the education of defendant's employees in the rules of the road, the train crews were directed to take the local operator's word as to the movements of trains, and that he, McCleary, had followed that course during his service as locomotive engineer for the defendant, which had continued through a period of four years. This was, therefore, not an isolated case in which a local operator had assumed to give instructions contrary to a written rule, but a compliance with a general custom established under directions from the defendant's trainmaster, who stood in the place of the master for the purpose of seeing " that proper precautions are taken to ensure the safety of trains and property." The evidence

upon that feature of the case was clearly sufficient to create an issue of fact, for if the practice testified to by McCleary had continued for a period of four years, it would have been competent for a jury to find that it was with the consent and approval of the defendant. While we think the case was clearly one for the jury upon that ground, we are also convinced that the general issue as to the sufficiency of the defendant's rules and regulations should have been submitted as a question of fact. The defendant's train dispatcher, who stood in the place of the master, knew that there was a fourth section of train No. 156 north of Machias. The addition of a few words to order No. 42 would have given notice of that fact to the operator at Machias and to the crew of extra No. 6324. Instead of making the situation entirely clear, the dispatcher sent an order which, to say the least, was of equivocal import and calculated to create doubt when there should have been naught but certainty. We think the case is well within the rule of such authorities as *Sheehan* v. *N. Y. C. & H. R. R. R. Co.* (91 N. Y. 332); *Dana* v. *N. Y. C. & H. R. R. R. Co.* (92 N. Y. 639), and *Hankins* v. *N. Y., L. E. & W. R. R. Co.* (142 N. Y. 416), to the effect that where a servant is injured by the negligent performance of an act or duty which the master as such is required to perform, the latter is liable although the negligence was that of another servant to whom the performance of the duty was intrusted, and this without regard to the rank or title of the person guilty of the negligence. We do not regard the cases of *Slater* v. *Jewett* (85 N. Y. 61) and *North. Pac. R. Co.* v. *Dixon* (194 U. S. 338), relied upon by the respondent, as being in conflict with the foregoing views or authorities, for, as we read these two cases, they have no application to the facts before us in the case at bar.

The judgment herein should be reversed and a new trial granted, with costs to abide the event.

Cullen, Ch. J., O'Brien, Edward T. Bartlett, Haight, Hiscock and Chase, JJ., concur.

Judgment reversed, etc.